# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

HAROLD K. RUMER, JR.,
        Plaintiff,

v.                                              Civil Action No. 1:04-CV-67
                                                (Keeley)

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.

## OPINION/ REPORT AND RECOMMENDATION

This is an action for judicial review of the final decision of the defendant Commissioner of

the Social Security Administration ("Defendant") denying the plaintiff's claim for disability

insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision

on the parties' cross motions for summary judgment, and has been referred to the undersigned

United States Magistrate Judge for submission of a Report and Recommendation. 28 U.S.C. §

636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Plaintiff Harold K. Rumer, Jr. ("Plaintiff") filed an application for DIB on March 13, 2002,

alleging disability since January 4, 2002, due to cardiovascular disease, diabetes, and arthritis (R.

115, 128). The claim was denied at the initial and reconsideration levels of review (R. 96-97).

Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Donald McDougall held on

February 3, 2003 (R. 33). Plaintiff, who was represented by counsel, appeared and testified on his

own behalf, along with a witness, Vicki Lewis, and Vocational Expert Eugene Czuczman ("VE").

On June 13, 2003, the ALJ issued a decision finding Plaintiff had not been under a disability, as

defined in the Social Security Act, at any time through the date of decision (R. 22). The Appeals

Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the

Commissioner (R.4).

## II. FACTS

Harold K. Rumer, Jr. ("Plaintiff") was born on July 13, 1955, and was 47 years old at the time of the Administrative Hearing (R. 44). He holds a Masters' Degree from West Virginia University (R. 219). His past relevant work experience consists of 14 years as an Industrial Hygienist, most recently managing asbestos control programs for West Virginia University, and two years as a Materials Manager at a hospital (R. 129). He also occasionally presented seminars for the Center for Environmental and Occupational Training (R. 49) and performed contract work for Monongalia General Hospital in the asbestos abatement area (R. 49-54, 77).

On February 19, 2001, Plaintiff presented to his treating physician, John Manchin, D.O., for follow up of his diabetes and arthritis (R. 238). The doctor noted Plaintiff had had psoriatic arthritis for over eight years. He was in quite a lot of pain. His blood sugars were also running high. Dr. Manchin ordered chest x-rays for Plaintiff's complaints of chest pain with hypertension (R. 240). The results were normal.

On June 12, 2001, Plaintiff saw Dr. Manchin for his severe arthritis and diabetes (R. 237). He also had a right inguinal strain with weakness in the right inguinal area.

On November 2, 2001, Plaintiff saw Dr. Manchin for a follow up of his polyarthralgia (R. 235).

On January 4, 2002, Plaintiff suffered a heart attack (R. 178). It was noted at his admission to Fairmont General Hospital that he had Type II non-insulin dependent diabetes and history of hypertension. He had no history of prior cardiac illness. He gradually improved during his two days in the hospital. Plaintiff was transferred to Ruby Memorial Hospital for cardiac catheterization and

2

angioplasty. His diagnosis upon discharge from Fairmont General Hospital was status-post acute lateral wall myocardial infarction, uncontrolled Type II diabetes and history of hypertension (R. 179). January 4, 2002, is Plaintiff's alleged onset date.

Plaintiff was admitted to Ruby Memorial Hospital on January 6, 2002 for cardiac catheterization (R. 209). The results indicated 90% stenosis in the diagonal and first septal branch of the left anterior descending coronary artery and 80-90% stenosis in the mid left anterior descending coronary artery. The distal left anterior descending coronary artery showed a long 80% stenosis, the left circumflex coronary artery showed a 30-40% proximal stenosis and distal 40-50% stenosis, the proximal right coronary artery showed 20-30% stenosis and the distal right coronary artery showed 30% stenosis.

Plaintiff underwent a triple coronary artery bypass graft. He tolerated the surgery without incident or complication. He was discharged seven days later (R. 209).

Plaintiff followed up with his treating physician Dr. Manchin, after his bypass surgery (R. 234). He was still having some chest pain, thought to be due to the surgery itself. He was to receive temporary disability from work while undergoing cardiac rehabilitation ("rehab").

On February 26, 2002, Dr. Manchin noted that Plaintiff's blood sugar was elevated, and increased his Glucophage (R. 233).

On March 12, 2002, Dr. Manchin noted Plaintiff was doing well in Stage-1 cardiac rehab (R. 232). He was, however, having pain, especially in the left shoulder. The doctor opined the pain was from the thoracotomy during surgery.

On April 9, 2002, Dr. Manchin noted Plaintiff had multiple medical problems including his heart disease, recurrent sternal pain, diabetes, and severe rheumatoid arthritis that was refractory to

3

almost every treatment he had tried (R. 230). He agreed to a shot of "Depo," although both he and the doctor were aware it would make his blood sugar rise. Dr. Manchin also ordered chest and sternal x-rays.

The x-rays showed no acute abnormality except for residuals of the cardiac surgery (R. 239).

One week later, Plaintiff still reported sternal pain from the thoracotomy (R. 229).

On May 9, 2002, Dr. Manchin noted Plaintiff's diabetes was out of control (R. 228). Plaintiff was going to see his cardiologist to see if he could get a back to work slip following cardiac rehab.

On May 13, 2002, Plaintiff underwent a physical performed by Diego Ponieman, , M.D., for the State agency (R. 219). Plaintiff told the doctor he was undergoing cardiac rehab, but had fatigue while doing activities of daily living. Plaintiff also complained of joint pain. He said he had been seen by a rheumatologist. He had been tried on methotrexate with no relief. The doctor noted Plaintiff was unable to shake hands due to swelling and pain. He also dressed and undressed himself with difficulty, but could climb on the examination table with no problem. Dr. Ponieman also noted Plaintiff had Type II diabetes. He was taking Zocor, Altace, Lopressor, Glucovance, Glyburide, Motrin, and Aspirin.

Upon physical examination, Plaintiff was 6'1" tall and weighed 227 pounds (R. 220). His heart had regular rate and rhythm with no murmurs, rubs or gallops. Plaintiff's extremities revealed significant synovitis of the MCP joints bilaterally and PIP joints bilaterally. There was also synovitis of the right knee. Plaintiff was able to ambulate, however, and his motor strength was within normal limits. He had decreased range of motion of the shoulders, wrists, right knee, left hip, cervical spine, and lumbar spine (R. 221-222). Straight leg raising was negative at 90 degrees on the right, but positive at 30 degrees on the left. Plaintiff could not make a fist with either hand. His upper

4

extremity strength was 5/5, but his grip strength was only 1/5 bilaterally. Dr. Ponieman opined that Plaintiff's fine manipulation was impaired. He also opined that Plaintiff gave good effort throughout the examination.

Dr. Ponieman noted that Plaintiff was unable to walk on heels and toes, and it was "very difficult" for him to ambulate. Dr. Ponieman concluded that Plaintiff had severe coronary artery disease – status post triple bypass, with type 2 diabetes, obesity, hypercholesterolemia, and polyarthritis (R. 220).

On May 14, 2002, Plaintiff presented to his cardiologist for a follow up of his bypass surgery (R. 224-225). Upon examination, vital signs were stable. He was recuperating from his surgery very well. Plaintiff told the doctor he wanted to return to work, and the doctor indicated he would fill out the necessary forms for Plaintiff to return to moderate reduced work.

On May 21, 2002, Plaintiff's treating physician, Dr. Manchin, wrote that Plaintiff was still having severe pain in his sternum area post-surgery (R. 226).

Plaintiff completed cardiac rehab on June 3, 2002 (R. 250). His main complaint throughout rehab was the chronic arthritic pain in his knees and shoulders. He tolerated the exercise well despite the pain and was reaching his target heart rate. His conditioning had improved greatly. He was also seeing an endocrinologist for his blood sugars which were "out of control most of the time running over 200."

Plaintiff saw Dr. Manchin on June 5, 2002, for complaints of "a lot of swelling in the hands and joints" (R. 292). Dr. Manchin gave him a shot of Depo Medro. The doctor stated: "Because it is getting so bad, we are going to refer him back to Rheumatology for this." He also referred Plaintiff to an endocrinologist for his diabetes, which was under better, but not optimum control.

On June 5, 2002, Dr. Manchin completed a form for Plaintiff's employer, noting that Plaintiff had completed cardiac rehab, but needed to remain off work due to continued complications (R. 318). He otherwise restricted Plaintiff's lifting to ten pounds and limited his walking and outdoor activities. Other physical activity was restricted as tolerated.

On June 30, 2002, State agency reviewing physician Thomas Lauderman, D.O. completed a Physical Residual Functional Capacity Assessment ("RFC"), based on a diagnosis of coronary artery disease status post bypass (R. 273). He opined Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, could stand and/or walk about six hours in an eight-hour workday, and could sit about six hours in an eight-hour workday (R. 274). He found Plaintiff could occasionally climb ramps/stairs/ladders/ropes/and scaffolds, and could occasionally balance, stoop, kneel, crouch, and crawl (R. 275).

Dr. Lauderman found Plaintiff's only manipulative limitation was on overhead reaching with his left arm (R. 276). Although he noted DDS physician Dr. Ponieman's findings that Plaintiff had only 1/5 grip strength, had difficulty dressing and undressing himself, was unable to make a fist or shake hands, and had impaired fine manipulation at the DDS physical, Dr. Lauderman found Plaintiff could do all fine and gross manipulation. He expressly based this finding only on Plaintiff's statement on his Activities of Daily Living questionnaire that he could shave himself. He did find Plaintiff would need to avoid concentrated exposure to temperature extremes, fumes, and hazards (R. 277). Dr. Lauderman reduced Plaintiff's RFC due to pain and fatigue and his status post bypass (R. 278).

On July 3, 2002, Plaintiff presented to endocrinologist Syed Haq for assessment of his diabetes (R. 293). His diagnosis was Diabetes Type II, with suboptimal control. Dr. Haq prescribed

some new medications to try. He also noted Plaintiff's hypertension was well controlled, his hyperlipidemia on Lipitor, and coronary artery disease – stable.

On August 23, 2002, State agency reviewing physician Hugh Brown, M.D., completed an RFC, based on coronary artery disease-status post bypass, and rheumatoid arthritis (R. 282). He found Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, walk/stand six hours in an eight-hour workday and sit six hours in an eight-hour workday (R. 283). He also found Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl (R. 284). Dr. Brown found no manipulative limitations whatsoever (R. 285). He found Plaintiff needed to avoid only concentrated exposure to temperature extremes (R. 286). He reduced Plaintiff's RFC to "light" based on his status post bypass with no significant angina, and rheumatoid arthritis with some decrease of range of motion.

On September 4, 2002, Dr. Manchin again completed a form for Plaintiff's employer, opining that Plaintiff needed to remain off work due to continued complications (R. 318).

On September 30, 2002, Plaintiff presented to Rheumatologist James Brick, M.D., for assessment of his psoriatic arthritis (R. 304). He noted he had been seeing another rheumatologist and had tried methotrexate and nonsteroidals with no relief. He had never tried Imuran, and his other rheumatologist was discussing a new drug, Enbrel. He wanted a second opinion from Dr. Brick.

Upon examination, Dr. Brick noted Plaintiff walked without a crutch or cane but had obvious swelling diffusely in both hands and in the MTP's of both feet, particularly the left (R. 304). He had psoriasis. His right knee had an effusion and his gait was antalgic. His spine had good motion with some pain. Dr. Brick discussed options including Imuran or Enbrel. He would inquire of his insurer of it would pay when the Enbrel became available. Dr. Brick diagnosed "Psoriatic arthritis-very

debilitating," and psoriasis-well controlled (R. 305).

Plaintiff's medical leave of absence from work was continued through January 3, 2003 (R. 317).

On October 7, 2002, Plaintiff presented to Dr. Manchin for fluid retention in his arms and hands (R. 296). The doctor noted Plaintiff had arthritis, severe degenerative joint disease, and rheumatoid arthritis. Upon examination, Plaintiff had swelling in the upper extremities, especially the hands. He was unable to move them. Dr. Manchin prescribed a Medrol Dose Pack and Depo Medrol.

On November 6, 2002, endocrinologist Syed Haq followed up with Plaintiff regarding his diabetes (R. 298). Plaintiff's blood sugar was running rather high despite medication. Plaintiff noted he had had to take a course of steroids for his arthritis which made his blood sugar rise. Dr. Haq opined Plaintiff's diabetes control had deteriorated. He increased his medications, but opined if the blood sugars continued to rise, he would have to try something else.

On December 16, 2002, Plaintiff saw Dr. Manchin for a follow-up of his diabetes, hypertension, and degenerative joint disease (R. 300). Plaintiff wanted an updated letter from Dr. Manchin allowing him to go back to work with limitations. Dr. Manchin noted multiple neuromuscular deficits of the joints secondary to arthritis.

On January 28, 2003, Dr. Manchin wrote a "To Whom it May Concern" letter, stating that Plaintiff had a long-standing history of diabetes mellitus, hyperlipoproteinemia, severe psoriatic arthritis, and coronary artery disease status post triple bypass (R. 291). He was on multiple medications and had increased physical problems resulting from his multiple medical problems.

Dr. Manchin noted that Plaintiff had previously wanted to try to return to gainful

employment, even though the doctor did not agree. After much discussion, they both decided that for Plaintiff to try to continue gainful employment at that time would be detrimental to his future livelihood. Dr. Manchin stated it was his professional opinion that Plaintiff's multiple medical problems were severe enough that he should not try to continue in his previous job, and should pursue disability due to his multiple medical problems.

At the administrative hearing on February 3, 2003, Plaintiff's counsel noted Plaintiff was not currently taking any specialized medications for his psoriatic arthritis because all he had tried had not worked or made him ill (R. 41). His rheumatologist was going to try a new medication, Enbrel, that was not yet available to the public. Plaintiff was unable to use steroidal medications because they caused his blood sugar levels to climb out of control.

Plaintiff testified he had worked with the arthritis, but it had been getting progressively worse over the last few years (R. 47). He was unable to perform most of the tasks required at his job at WVU, but was often able to have a graduate assistant go with him to help. Sometimes he would have to delay doing certain jobs until an assistant became available. Although his doctor wrote to his employer stating he could work with restrictions, his employer would not authorize him to come back. Plaintiff testified his employer was particularly concerned about his safety, but also did not think he could physically sustain the day-to-day activities. Plaintiff testified he had been functioning with the arthritis and diabetes until his heart attack, which he described as "the icing on the cake. It just exacerbated everything" (R. 55). He testified that he had largely recovered from his bypass surgery with the exception of his left shoulder and arm problems and pain. He testified he had little use of his left arm.

When asked the main reason he could not work, Plaintiff testified it was a combination of

his problems. He thought he could deal with just one issue, but the combination was overwhelming, especially the constant pain in his hands, knees, hip, back, shoulder, and chest. He was taking prescription Motrin, and had tried other prescriptions but they had made him ill. He would have steroid injections when the pain became severe, but it sent his blood sugar too high, and he was no longer allowed steroids.

Plaintiff testified he walked about a quarter mile when the whether was good, but that his legs and knees would swell if he overdid it (R. 58). He also testified he often dropped things, although he could use a knife and fork and could hold a cup if he used two hands. He also became fatigued very easily (R. 64). He did some cooking and some cleaning, including washing a small number of dishes. He did have problems bathing and getting dressed. He sometimes could not reach his feet to put on trousers or socks and shoes, and had trouble putting on and taking off his shirt. His live-in girlfriend often helped him dress.

Plaintiff testified he hadn't made a fist in years, and could only touch his thumbs with his index and middle fingers bilaterally. It was noted at the hearing that Plaintiff's hands were puffy. Plaintiff testified his feet were the same as his hands, although somewhat better. He also had the arthritis in both knees and the left hip.

Plaintiff's girlfriend also testified at the hearing. As the ALJ found, she corroborated Plaintiff's testimony. She testified Plaintiff was much more lethargic since the heart attack approximately a year earlier. She helped him get up in the morning, helped him with his shower, and helped him dress– putting on his pants, shirt, socks, and shoes (R. 81). She had a full-time job at WVU, but also helped Plaintiff with his self-employment which consisted of occasional asbestos abatement reports and seminars. She went with him on the assignments and typed up the reports for

10

him. She did not assist with the seminars except for carrying his materials for him. She also testified his concentration was not what it had been, and it took him longer to get things done.

The ALJ asked the VE a hypothetical limiting the individual to sedentary work, with the ability to change position for a brief period every half hour, with only occasional use of the hands, and that use reduced because the individual was unable to make a fist or pinch together any fingers but the thumbs and index fingers bilaterally. He could also occasionally climb, balance, stoop, kneel, crouch, and crawl (R. 87). The VE testified the hand problems would disallow a sorter or inventory clerk job because the person would be unable to pick up papers continuously and quickly as required. He did testify the hypothetical individual could perform the jobs of laminator I, mounter by hand, and surveillance system monitor, all of which jobs were available in significant numbers in the national economy, although he also testified the individual would need to be able to grasp and turn a valve for the laminator job.

On February 10, 2003, Plaintiff saw his rheumatologist Dr. Brick for a follow-up of his arthritis (R. 324). The Enbrel had just been approved by the FDA, and Plaintiff was going to try it, even though he stated he could not really afford it. Upon examination, Dr. Brick noted Plaintiff's hands were puffy all over, and he had psoriasis (R. 324). He was not using a cane, but had a limp. Dr. Brick's diagnosis was "psoriatic arthritis-miserable." He advised Plaintiff to try the Enbrel.

An additional issue in this case is whether Plaintiff had substantial gainful employment during 2002. The ALJ found he had. Plaintiff stated he stopped working at his regular job at WVU as an industrial hygienist on January 4, 2002, when he had his heart attack (R. 128). He had, however, continued to do some occasional self-employment work up until late October or early November 2002. Plaintiff submitted to the ALJ his 1099 forms for 2002 along with his records from

his personnel file at WVU (R. 171). Plaintiff's 2002 Form 1099-MISC from Monongalia General Hospital shows $8,371.00 in nonemployee compensation (R. 173). The paystubs from that period also equal $8,371.00, but one of the paystubs, for $3,092.00, is from December 2001 (R. 174). Plaintiff therefore argues that that amount should not be attributed to his 2002 earnings. There are additional 1099's from the Center for Environmental and Occupational Training, Inc. ("CEOT") for $3,062.50, and from Preston County Schools for $740.00, that are not in dispute (R. 176-177). If the 12/28/2001 pay is included, Plaintiff's earnings for 2002 would equal $12,173.50. If that pay is not included, Plaintiff's earnings for 2002 would equal $9,081.50.

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520, the ALJ made the following findings:

1.  The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since December 31, 2002.

3.  The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations. 20 CFR § 404.1520(b).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §404.1527).

7.  The claimant has the residual functional capacity for sedentary work with no

12

concentrated heat/cold; occasional climbing, balancing, stooping, kneeling, crouching, or crawling; must be able to briefly (1-2 minutes) change positions at least every one-half hour; occasional use of the hands and then only with ability to fully pinch thumb and index fingers; occasional writing; no exposure to concentrated levels of fumes, dusts, gases or other respiratory irritants; no overhead reaching on the left non-dominant side; and no significant workplace hazards like heights or dangerous moving machinery.

8.     The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

9.     The claimant is a "younger individual" (20 CFR § 404.1563).

10.    The claimant has a "more than a high school (or high school equivalent) education" (20 CFR § 404.1564).

11.    The claimant has no transferable skills from semi-skilled work previously performed as described in the body of the decision (20 CFR 1 404.1568).

12.    The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR § 416.967).

13.    Although the claimant's exertional limitations do not allow him to perform the full range of sedentary work, using Medical-Vocational Rule 201.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs as enumerated by the vocational expert include work in the regional/national economies such as a laminator (400/75,000 jobs), mounter by hand (500/95,000 jobs), and surveillance system monitor (4,000/200,000 jobs).

14.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

(R. 21-22).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo

review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (*quoting Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The ALJ's analysis of why Plaintiff does not meet Listing 14.09 is incomplete, does not properly apply the standards of analysis contained in 14.00B6b and 1.00B2b and B2c, and is not supported by substantial evidence;

2. The ALJ failed to properly evaluate all of Plaintiff's impairments in combination; and

3. The ALJ erred by finding Plaintiff was engaged in substantial gainful activity in 2002.

Defendant contends:

1. Substantial evidence supports the ALJ's finding that Plaintiff's impairments did not meet Listing 14.09;

2. Substantial evidence supports the ALJ's conclusion that Plaintiff was not disabled by his combined impairments; and

3.  Substantial evidence supports the ALJ's conclusion that Plaintiff was engaged in substantial gainful activity prior to December 31, 2002.

### C.  Listing 14.09

Plaintiff first argues the ALJ's analysis of why he did not meet Listing 14.09 is incomplete, does not properly apply the standards of analysis contained in 14.00B6b and B2c, and is not supported by substantial evidence.  Defendant contends substantial evidence supports the ALJ's finding that Plaintiff's impairments did not meet Listing 14.09.  Listing 14.09 provides, in pertinent part:

> 14.09 *Inflammatory arthritis*.  Documented as described in 14.00B6, with one of the following:
>
> A.  History of joint pain, swelling, and tenderness, and signs on current physical examination of joint inflammation or deformity in two or more major joints *resulting in inability to ambulate effectively or inability to perform fine and gross movements effectively, as defined in 14.00B6b and 1.00B2b and B2c . . . .*

(Emphasis added).  Because the ALJ found the medical evidence showed  Plaintiff had psoriatic arthritis and neither party  disputes this finding, the undersigned does not evaluate the "documentation needed to establish the existence of a connective tissue disorder," pursuant to 14.09 and 14.00B6.  Nor does either party dispute that Plaintiff had a "[h]istory of joint pain, swelling, and tenderness, and signs on current physical examination of joint inflammation or deformity in two or more major joints."  Therefore, the only issue in dispute regarding the Listing is whether Plaintiff's arthritis resulted in "an inability to ambulate effective or inability to perform fine and gross movements effectively."

Listing 1.00B2b provides as follows:

> (1) *Definition*.  Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain or complete activities.

Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities . . . .

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices, does not, in and of itself, constitute effective ambulation.

Listing 1.00B2c provides:

Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

Plaintiff first argues that the ALJ did not sufficiently evaluate his impairment under Listing 14.09.

In this regard, the Fourth Circuit has held:

The ALJ should have identified the relevant listed impairments. He should then have compared each of the listed criteria to the evidence of [Plaintiff's] symptoms. Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination.

*Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986). Here the ALJ found:

[T]he claimant in this case certainly approaches the standards set forth in 14.09. But he retains sufficient ability to perform fine and gross dexterous movements so as not to meet or equal the listing. The claimant has some difficulty walking but does not require assistive devices for ambulation. He has limited use of his hands, but admittedly can wash dishes. Therefore, the inability to effectively perform fine and gross dexterous movements is not at listing level.

16

(R. 17). The undersigned finds this explanation insufficient under *Cook*. A review of 1.00B2b shows there is much more to the analysis regarding the inability to ambulate effectively than simply whether or not the claimant uses ambulatory assistance devices. The State agency examining physician noted Plaintiff was unable to walk on his heels and toes, that his gait was antalgic, and that it was "very difficult [for Plaintiff] to ambulate" (R. 222). Further, no one questioned whether Plaintiff was able to use ambulatory assistive devices considering his inability to make a fist, shake hands or pinch any more than his thumbs and forefingers together with either hand.

Similarly, the undersigned does not find that Plaintiff's ability to wash a few dishes necessarily means he has the ability to perform fine and gross movement effectively under 1.00B2c. The State agency examining physician noted that Plaintiff was unable to make a fist with either hand, had difficulty dressing and undressing, had grip strength of only 1 out of 5 bilaterally, and his fine manipulation was impaired (R. 221). The ALJ himself found Plaintiff could use his hands only occasionally, and could only pinch with his thumbs and index fingers bilaterally. Plaintiff testified that he had difficulty dressing and using buttons, and could not keyboard. His girlfriend testified she needed to help him dress and did all his typing.

Dr. Brick, Plaintiff's treating Rheumatologist, diagnosed Plaintiff with "Psoriatic arthritis – very debilitating," and "psoriatic arthritis- miserable"(R. 306, 324).

Without more of an explanation from the ALJ regarding the listings, "it is simply impossible to tell whether there was substantial evidence to support the determination." *Cook, supra.* The undersigned therefore finds substantial evidence does not support the ALJ's determination that Plaintiff did not meet or equal Listing 14.09.

### D. Combination of Impairments

Plaintiff next argues the ALJ failed to properly evaluate all of his impairments in

combination. Defendant contends substantial evidence supports the ALJ's conclusion that Plaintiff was not disabled by his combined impairments. 42 U.S.C. § 423(d)(2)(B) and 42 U.S.C. § 1382(c)(a)(3)(F) provide:

> In determining whether an individual's physical or mental impairment or impairments are of sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, *the combined impact of the impairments shall be considered throughout the disability determination process*.

(Emphasis added). The Fourth Circuit held that the Commissioner must consider the combined effect of a claimant's multiple impairments and cannot fragmentize them. *Walker v. Bowen*, 889 F.2d 47, 49-50 (4th Cir. 1989) ("It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render a claimant unable to engage in substantial gainful activity."); *DeLoatche v. Heckler*, 715 F.2d 148 (4th Cir. 1983) (noting at page 150 that the most egregious error made by the ALJ was his "failure to analyze the cumulative or synergistic affect DeLoatche's various maladies have on her ability to work"). "As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker, supra*, at page 50.

The undersigned finds the ALJ did not properly consider the combined effect of Plaintiff's multiple impairments and did not adequately explain his evaluation of the combined effects of the impairments. In particular, Plaintiff's combination of diabetes and arthritis needs to be discussed in combination because the treatment of the arthritis pain often caused unacceptable spikes in his blood sugar. He therefore was not trying or had already stopped taking several pain medications. The ALJ did not explain this when discussing Plaintiff's lack of prescription pain medications.

## E. Credibility

In addition to the above, the undersigned also finds the ALJ's credibility analysis was fatally flawed in this case. First, the ALJ did not make the threshold determination in his credibility analysis of whether these impairments, singly or in combination, could reasonably cause the symptoms Plaintiff alleged. This omission alone would warrant remand. *See Craig v. Chater*, 76 F. 3d 585 (4th Cir. 1996).[1]

The ALJ's analysis at step two was also insufficient, however. Plaintiff alleged limited use of his left arm with pain since his bypass surgery. He also alleged a frozen left shoulder. The ALJ did not find this a severe or even a medically determinable impairment, and did not explain why he did not. In addition, Plaintiff alleged constant pain in his hands, knees, hips, chest, and back, with intermittent swelling of his feet. He alleged he was unable to make a fist and had difficulty with buttons. He alleged he fatigued easily. He became "fuzzy" at time due to spiking sugar levels. He had blurry vision at times for the same reason. The ALJ found Plaintiff's girlfriend corroborated Plaintiff's allegations of pain and limitation. Yet he found the testimony not entirely credible in part because Plaintiff had a good work record and continued to have some work activity periodically in the self-employment mode. The ALJ did not discuss, however, Plaintiff's testimony that he was a long-time employee who was provided substantial assistance by graduate students so he could continue in his full time employment. In addition, his girlfriend provided substantial assistance in his occasional self-employment jobs. The ALJ noted Plaintiff's psoriatic arthritis affected his upper and lower extremities, but then only noted he required no assistive devices. The ALJ incorrectly

---

[1]Although Plaintiff did not expressly make the argument that the ALJ's credibility analysis was in error, the argument is implicit in both Plaintiff's and Defendant's contentions regarding Plaintiff's ability to work with his arthritis and diabetes and Defendant's argument regarding Dr. Manchin's opinion.

found Plaintiff took no prescribed pain medication. Plaintiff testified he did take prescription medications, but no steroids. The ALJ noted Plaintiff reported fatigue and a disturbed sleep pattern, but dismissed those symptoms based on Plaintiff's testimony that he did not like to sleep during the day. The undersigned does not find this testimony makes Plaintiff's allegations that he did not sleep well at night incredible. The ALJ also noted Plaintiff's reports of blurry vision, but then dismissed them, noting only that no acute changes were noted on a physical examination recorded in Exhibit 5F, page 7. That report, however, is specifically a follow-up of Plaintiff's heart surgery. There is no indication of a visual acuity test, just a notation under HEENT that "no acute changes seen." While the ALJ noted Plaintiff's blood sugar levels fluctuated, he simply found Plaintiff had no end organ damage and required only non-insulin drugs. He failed to discuss the fact that Plaintiff's diabetes was uncontrolled much of the time. The ALJ pointed out that Plaintiff was previously on steroids and methotrexate, but failed to mention that these were discontinued or used sparingly because they raised Plaintiff's blood sugar levels and made him ill.

The undersigned therefore finds substantial evidence does not support the ALJ's credibility determination.

### E. SGA Prior to December 31, 2002

Plaintiff next argues he was not engaged in substantial gainful activity ("SGA") in 2002. Defendant contends substantial evidence supports the ALJ's conclusion that Plaintiff was engaged in substantial gainful activity prior to December 31, 2002. Plaintiff did stop work as an employee for WVU on January 4, 2002. He testified, however, that he continued to do some occasional self-employment work for Monongalia General Hospital, CEOT, and Preston County Schools. He did project design for Monongalia General, consisting of writing out how projects should be done (R. 50). Plaintiff's girlfriend testified she went with him on these projects and then typed out the reports.

For CEOT he provided training seminars (R. 52). He would put together the program, while CEOT would do the advertising and accounting. Plaintiff testified that over the years he did not actively market this work and did not look for it. Instead, he would be called when CEOT needed new employees trained. He also testified the seminars lasted a half day, and required little preparation, as he had been doing them for 14 years.

§404.1572 provides as follows:

1. Substantial gainful activity is work activity that is both substantial and gainful:

(a) *Substantial work activity.* Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b) *Gainful work activity.* Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.

(c) *Your earnings may show you have done substantial gainful activity.* Generally, in evaluating your work activity for substantial gainful activity purposes, our primary consideration will be the earnings you derive from the work activity. We will use your earnings to determine whether you have done substantial gainful activity unless we have information from you, your employer, or others that shows that we should not count all of your earnings. The amount of your earnings from work you have done (regardless of whether it is unsheltered or sheltered work) may show that you have engaged in substantial gainful activity. Generally, if you worked for substantial earnings, we will find that you are able to do substantial gainful activity. However, the fact that your earnings were not substantial will not necessarily show that you are not able to do substantial gainful activity. We generally consider work that you are forced to stop or to reduce below the substantial gainful activity level after a short time because of your impairment to be an unsuccessful work attempt. Your earnings from an unsuccessful work attempt will not show that you are able to do substantial gainful activity. We will use the criteria in paragraph (c) of this section to determine if the work you did was an unsuccessful work attempt.

(2) *Earnings that will ordinarily show that you have engaged in substantial gainful activity.* We will consider that your earnings from your work activity as an employee (including earnings from sheltered work, see paragraph (b)(4) of this section) show that you engaged in substantial gainful activity if:

1. (i) *Before January 1, 2001,* they averaged more than the amount(s) in Table 1 of this section for the time(s) in which you worked.

(ii) *Beginning January 1, 2001,* and each year thereafter, they average more than the larger of:

(A) The amount for the previous year, or

(B) An amount adjusted for national wage growth, calculated by multiplying $700 by the ratio of the national average wage index for the year 2 calendar years before the year for which the amount is being calculated to the national average wage index for the year 1998. We will then round the resulting amount to the next higher multiple of $10 where such amount is a multiple of $5 but not of $10 and to the nearest multiple of $10 in any other case.

Under (B), above the monthly amount presumptively considered SGA in 2002 was $780.00.

Plaintiff stated he stopped working for WVU on January 4, 2002, when he had his heart attack (R. 128). He did, however, have income from self-employment in 2002. Plaintiff submitted to the ALJ his 1099 forms for 2002 along with his records from his personnel file at WVU (R. 171). Plaintiff's 2002 Form 1099-MISC from Monongalia General Hospital shows $8,371.00 in nonemployee compensation (R. 173). The paystubs from that period also equal $8,371.00. Plaintiff argues, however, that the first paystub, with an amount of $3,092.00 was dated December 2001, and therefore should not have been attributed to his 2002 earnings (R. 174). There are additional 1099's from the Center for Environmental and Occupational Training, Inc. ("CEOT") for $3,062.50, and from Preston County Schools for $740.00, which are not in dispute (R. 176-177). If the 12/28/2001 pay is included, Plaintiff's earnings for 2002 would equal $12,173.50. If that pay is not included, Plaintiff's earnings for 2002 would equal $9,081.50. Averaging $12,173.50 over 12 months would be $1,104.45. Averaging $9,081.50 over 12 months would equal $756.79. Under 404.1574(b)(2), income averaging $780.00 per month would presumptively show a claimant engaged in SGA. Under Plaintiff's argument, his average income of $756.79 would be below the amount presumptively considered SGA, albeit only by $13.21 a month. Under the ALJ's and Defendant's argument,

22

however, he would be well above the monthly amount.

Plaintiff argues that the 12/28/2001 income "clearly" should not have been included in his earnings for 2002 (Plaintiff's brief at 12). Defendant argues that the amount was included in Plaintiff's wage total for 2002 in documents prepared for IRS purposes by the payor (the 1099 form). The ALJ found it would be inconsistent to consider these wages as 2002 earnings for tax purposes but not for Social Security purposes (R. 15-16). Neither party cites any law in support of its argument, and the undersigned was unable to locate any. While the ALJ's argument is logical regarding income tax and Social Security tax and even Social Security benefits, the undersigned finds the 2001 income should not be added to Plaintiff's 2002 income for purposes of determining whether Plaintiff had substantial gainful activity in 2002. Actual earnings are used only as evidence to show a claimant performed substantial gainful activity. There is no doubt that Plaintiff performed the activity at issue in 2001 and not in 2002. There is also no doubt he performed the activity before his heart attack which is his alleged onset date, when he stopped working his full-time job. The undersigned finds it would be illogical to determine that income indisputably derived from work in 2001 indicates an individual performed substantial gainful activity in 2002.

The undersigned therefore finds substantial evidence does not support the ALJ's determination that Plaintiff's earnings for SGA purposes in 2002 were $12,173.50. Instead, the evidence shows Plaintiff's earnings in 2002 for evidence of SGA equaled $9,081.50. Averaging $9,081.50 over 12 months equals $756.79 per month. Under 404.1574(b)(2), income averaging $780.00 per month would presumptively show a claimant engaged in SGA. Plaintiff's average income of $756.79 per month would be below the presumptive amount for SGA, albeit only by $13.21.

23

This does not end the discussion, however. Although evidence of SGA, the amount of income is not dispositive, especially where, as here, the claimant is self-employed. § 404.1575 provides as follows:

(a) *If you are a self-employed person.* If you are working or have worked as a self-employed person, we will use the provisions in paragraphs (a) through (d) of this section that are relevant to your work activity. We will use these provisions whenever they are appropriate, whether in connection with your application for disability benefits (when we make an initial determination on your application and throughout any appeals you may request), after you have become entitled to a period of disability or to disability benefits, or both. We will consider your activities and their value to your business to decide whether you have engaged in substantial gainful activity if you are self-employed. *We will not consider your income alone because the amount of income you actually receive may depend on a number of different factors, such as capital investment and profit-sharing agreements.* We will generally consider work that you were forced to stop or reduce to below substantial gainful activity after 6 months or less because of your impairment as an unsuccessful work attempt. See paragraph (d) of this section. We will evaluate your work activity based on the value of your services to the business regardless of whether you receive an immediate income for your services. We determine whether you have engaged in substantial gainful activity by applying three tests. If you have not engaged in substantial gainful activity under test one, then we will consider tests two and three. The tests are as follows:

(1) *Test One:* You have engaged in substantial gainful activity if you render services that are significant to the operation of the business and receive a substantial income from the business. Paragraphs (b) and (c) of this section explain what we mean by significant services and substantial income for purposes of this test.

(2) *Test Two:* You have engaged in substantial gainful activity if your work activity, in terms of factors such as hours, skills, energy output, efficiency, duties, and responsibilities, is comparable to that of unimpaired individuals in your community who are in the same or similar businesses as their means of livelihood.

(3) *Test Three:* You have engaged in substantial gainful activity if your work activity, although not comparable to that of unimpaired individuals, is clearly worth the amount shown in §404.1574(b)(2) when considered in terms of its value to the business, or when compared to the salary that an owner would pay to an employee to do the work you are doing.

(b) *What we mean by significant services.* (1) If you are not a farm landlord and you operate a business entirely by yourself, any services that you render are significant to the business. If your business involves the services of more than one person, we will consider you to be rendering significant services if you contribute more than half

24

the total time required for the management of the business, or you render management services for more than 45 hours a month regardless of the total management time required by the business.

. . . .

(c) *What we mean by substantial income.* We deduct your normal business expenses from your gross income to determine net income. Once we determine your net income, we deduct the reasonable value of any significant amount of unpaid help furnished by your spouse, children, or others. Miscellaneous duties that ordinarily would not have commercial value would not be considered significant. We deduct impairment-related work expenses that have not already been deducted in determining your net income. Impairment-related work expenses are explained in §404.1576. We deduct unincurred business expenses paid for you by another individual or agency. An unincurred business expense occurs when a sponsoring agency or another person incurs responsibility for the payment of certain business expenses, e.g., rent, utilities, or purchases and repair of equipment, or provides you with equipment, stock, or other material for the operation of your business. We deduct soil bank payments if they were included as farm income. That part of your income remaining after we have made all applicable deductions represents the actual value of work performed. The resulting amount is the amount we use to determine if you have done substantial gainful activity. We will generally average your income for comparison with the earnings guidelines in §§404.1574(b)(2) and 404.1574(b)(3). See §404.1574a for our rules on averaging of earnings. We will consider this amount to be substantial if—

(1) It averages more than the amounts described in §404.1574(b)(2); or

(2) It averages less than the amounts described in §404.1574(b)(2) but it is either comparable to what it was before you became seriously impaired if we had not considered your earnings or is comparable to that of unimpaired self-employed persons in your community who are in the same or a similar business as their means of livelihood.

Social Security Ruling ("SSR") 83-34 also defines *Significant Services* as follows:

a. *Self-Employed Persons Other Than Farm Landlords.* Self-employed carpenters, gardeners, handymen, nurses, bookkeepers, consultants, and people in numerous other one-person business operations may engage in their trade or profession by themselves, without employees, partners, or other assistants. ***The services of an individual in a one-person business are necessarily "significant."*** The receipt of substantial income by the operator of a one-person business will result in a finding of SGA. Where income is not substantial, SGA may be found on the basis of tests two or three (the comparability or worth of work tests) as explained in section B. below.

(Emphasis added). The undersigned finds Plaintiff's business was conducted as a one-person

business, despite his girlfriends' assistance. His services were therefore necessarily "significant."

If he received substantial income he would be found to have engaged in substantial gainful activity

during 2002. As already noted, the undersigned finds Plaintiff earned, on average, just under the

amount presumptively considered SGA. Further, Plaintiff argues that his girlfriend provided a

significant amount of unpaid help with his self-employment work. The ALJ found Plaintiff had no

significant work expenses because he "paid no one else anything" (R. 16). There is, however, an

express provision in the Ruling for evaluating unpaid assistance, as follows:

> *Unpaid Help:* The reasonable monetary value of any significant amount of
> unpaid help furnished by a spouse, children, or others should be deducted
> from net income. The file should include facts which would permit an
> estimate of the reasonable value of unpaid help furnished by family members
> or others. When it is clear that the help rendered consists of miscellaneous
> duties carried on in connection with the person's general activities as a
> member of the household or as a friend, statement to this effect will be
> sufficient, and no estimate of value will be necessary (e.g., a farmer's children
> feed a small flock of chickens or tend a home garden). On the other hand,
> where the help furnished is of a nature to which commercial value would
> ordinarily be assigned, the following type of information should be in the file:
> the name of the helping individual and this person's relationship to the
> impaired self-employed individual; the reason why unpaid help was
> furnished; a full account of the services rendered, the amount of time
> furnished, and how long the arrangement existed; an estimate of the
> reasonable value of the services, on the basis of prevailing pay for that type
> of work in the community; and, if the help was furnished by a spouse or by
> a child under age 18, an explanation of how the previous pattern of such
> individual's activities was affected, if at all.

> 1. In estimating the amount to be deducted for unpaid help, it is necessary to
> consider the prevailing wage rate in the community for similar services.
> Where the unpaid help is rendered on a part-time or intermittent basis, only
> the pro rata value attributable to the services actually performed (as compared
> with those that a full-time employee would perform) should be deducted.

> *EXAMPLE:*

> Mr. J., a former automobile mechanic, became disabled as a result of an
> accident. Through the services of a rehabilitation agency, he opened a candy
> and cigarette counter in January 1982 in the lobby of an office building. He
> ran the business as a self-employed individual and was able to serve

26

customers, make change, and perform the various other duties connected with the business. However, once a day, he needed help in restocking the shelves. Mr. W., an elevator operator in the same building, donated an hour of his time each day, without pay, to perform this service for the claimant. In estimating the amount to be deducted from net income, the prevailing local rate of $3.25 an hour for this type of help was used. Hence, although Mr. J.'s net reportable income for income tax purposes was $3,900 a year (or an average of $325 a month), his income was found not substantial because the deduction of approximately $65 per month for unpaid help resulted in "countable income" which was not more than $300 per month for 1982; and, development established that Mr. J.'s livelihood from the vending stand was not comparable either to his own past personal standard of livelihood or to the community standard of livelihood as explained in subsection 2.c. below.

The undersigned cannot determine from the evidence in the record what the value of Plaintiff's girlfriend's unpaid work was, or even if the ALJ considered her unpaid work in his evaluation of SGA. It appears from a review of the decision that he did not. Upon remand, therefore, Plaintiff shall provide to the Commissioner a full account of the services his girlfriend rendered in conducting his business, the amount of time furnished, and how long the arrangement existed and an estimate of the reasonable value of the services, on the basis of prevailing pay for that type of work in the community. Upon receipt of that information, the ALJ shall first determine whether Plaintiff had substantial income under the tests enumerated in § 404.1575(c)(1) and (2). If not, the ALJ shall next determine whether Plaintiff nevertheless meets the requirements for substantial income under the Tests in § 404.1575(a)(2) and (3).

## V. RECOMMENDATION

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's decision that Plaintiff was not under a disability at any time through the date of his decision.

I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED**, and Plaintiff's Motion for Summary Judgment be **GRANTED in part** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner

for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this __8__ day of April, 2005.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE